# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| YORLANDA FISHER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-06-2232 |
| | § | |
| CERTIFIED SAFETY SPECIALISTS, LLC, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court are defendant's motion for summary judgment (Dkt. 13) and motion to strike evidence (Dkt. 17). Having considered the parties' pleadings and arguments, the summary judgment evidence, and the applicable law, the court is of the opinion that the defendant's motion for summary judgment be GRANTED. Furthermore, defendant's motion to strike evidence is DENIED as moot.[1]

## BACKGROUND

In 2003, defendant Certified Safety Specialists, L.L.C. ("CSS"), hired plaintiff Yorlanda Fisher as safety attendant. Subsequently, CSS promoted Fisher to safety specialist. As a safety specialist, Fisher supervised safety attendants and performed safety audits and inspections. In 2004, CSS hired Frank Browne, a white male, as project manager.[2] In August 2005, after working on

---

1   After reviewing all of the proffered summary judgment evidence, the court nevertheless finds it inadequate. Without considering the admissibility of any specific evidence, the court finds no genuine issue of material fact as to plaintiff's Yorlanda Fisher's employment discrimination claims.

2   Fisher alleges that at that time, she and the only other female supervisor were demoted. Fisher disputes CSS's assertion that she had been terminated, not demoted. CSS explains that Fisher's employment was "project based." (Dkt. 13, Ex. B-1, Depo. 44 (admitting that the nature of her employment with CSS was project based)). Rather than being demoted, CSS asserts that Fisher was terminated at the conclusion of that particular project and rehired as a safety attendant on a subsequent project.

numerous projects for CSS, Fisher accepted a night shift supervisor position on a CSS project called Chocolate Bayou. Thereafter, Browne was assigned to manage the project. He retained Ron Lewis, a white male, to manage the night shift.[3] Browne also hired Daniel Lloyd, a white male, rather than Mildred Johnson, an African-American female recommended by Fisher, as a lead of one of the crews Fisher supervised. Over the following months, Fisher repeatedly complained to Lewis about Lloyd's inadequate work performance.[4] On October 14, 2005, Fisher reported Lloyd's unsafe conduct to a representative of the company which retained CSS. Fisher made the report prior to consulting Browne or Lewis. The next day, Fisher attended a meeting with Browne and Lewis, during which she claims that Browne yelled and made gender-based remarks because Fisher had reported the incident to the client. CSS contests Fisher's interpretation. Rather, CSS claims that Browne and Lewis met with Fisher to discuss an incident recently witnessed by Browne involving her interaction with a new hire. On October 17, and throughout the October 18 night shift, numerous CSS employees filed formal complaints against Fisher.[5] On October 18,[6] CSS terminated Fisher's employment, citing Fisher's verbal abuse of employees and her use of fear and intimidation to manage those employees. On April 26, 2006, Fisher filed a formal employment discrimination

---

3       Fisher suggests that by retaining Lewis to manage the night shift crew, which included supervising Fisher, Browne intended to antagonize her. As evidence, Fisher attests to Lewis telling her that "he didn't know why CSS had put him in as the night project manager because they didn't need him in the position because [Fisher] was much more qualified than he was." (Dkt. 16, Ex. 1).

4       CSS notes that Fisher did not file any formal complaints against Lloyd.

5       Fisher alleges that only two CSS employees, one of whom was Lloyd, filed complaints prior to her termination. All other complaints, she claims, were solicited after CSS terminated her employment.

6       In her deposition, Fisher repeatedly contests the termination date. She alleges that the termination occurred on October 17, rather than October 18. She explains that she signed the termination form dated October 18 because she was exhausted and did not notice the incorrect date. Fisher further explains that she reported October 18 as the termination date in her EEOC questionnaire, and a few days later in her charge, because she was relying on the termination form.

charge with the U.S. Equal Employment Opportunity Commission ("EEOC").

### STANDARD OF REVIEW

Summary judgment should be granted if the record, taken as a whole, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *N.Y. Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (quoting *Celotex*, 477 U.S. at 323-25). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

If the moving party meets this burden, however, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Little*, 37 F.3d at 1075; *Wallace*, 80 F.3d at 1047. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Wallace*, 80

3

F.3d at 1048 (quoting *Little*, 37 F.3d at 1075); *see also S.W.S. Erectors, Inc. v. Infax, Inc.*,72 F.3d 489, 494 (5th Cir.1996). The court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.1995), *as revised on denial of reh'g*, 70 F.3d 26 (5th Cir.1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51, 106 S. Ct. 2505 (1986).

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

### ANALYSIS

### Hostile Work Environment

Fisher asserts a claim for discriminatory conduct in violation of Title VII based on the hostile work environment theory. (Dkt. 1). To establish a *prima facie* case of hostile work environment, an employee must show that (1) she belongs to a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based on the employee's membership in the protected group, (4) the harassment affected a term, condition, or privilege of her employment, and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *See Celestine v. Petroleos de Venez. SA*, 266 F.3d 343, 353 (5th Cir. 2001). The employee need only establish the first four *prima facie* elements, however, where the harassment was allegedly committed by a supervisor with immediate (or successively higher) authority over the employee–victim. *Fragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Hence, an employer

4

is vicariously liable for the supervisor's conduct if the employee makes the four-part *prima facie* showing of harassment by a supervisor. *Id.* Note that in cases where the supervisor's harassment did not culminate with any "tangible employment action" against the employee, the employer is entitled to an affirmative defense. *Id.*

Because hostile work environment claims may involve repeated conduct, rather than discrete acts, a court evaluating the discrimination claim may consider acts that occurred outside of the Title VII EEOC charge filing period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002) ("The 'unlawful employment practice' . . . cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."). "Provided that an act contributing to the claim occurred within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*; *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004).[7]  A plaintiff subjected to discriminatory acts within the state of Texas, a "deferral state,"[8] must file a charge with the EEOC no later than 300 days after learning of the

---

[7]     The "continuing violation" doctrine is not automatic.  Rather, the burden remains on the employee to demonstrate that an organized scheme led to and included the present violation. *Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998); *Berry v. Bd. of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir. 1983). "[T]he continuing violation theory requires the same type of discriminatory acts to occur both inside and outside the limitations period," such that a valid connection exists between them. *Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913 (5th Cir. 2000). "[W]here a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues that she was a victim of actionable harassment, she can not reach back and base her suit on conduct that occurred outside the statute of limitations." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999).  In this case, the result of a "continuing violation" analysis will not alter the court's final disposition. Therefore, the discussion is omitted and all of Fisher's evidence will be considered by the court for its hostile work environment analysis.

[8]     A "deferral state" is one with its own employment discrimination law and enforcement agency. *Broussard v. Oryx Energy Co.*, 110 F. Supp. 2d 532, 537 n.6 (E.D. Tex. 2000).  When the locale of the purported discriminatory employment practice is a "deferral state," Title VII extends the EEOC charge filing period from 180 days to 300 days. *See, e.g.*, *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 118 n.15 (2002).

employer's alleged unlawful conduct.[9] *Simotas v. Kelsey-Seybold*, 211 Fed. Appx. 273, 275 (5th Cir. 2006) ("In a 'deferral state' such as Texas, the [EEOC] charge must be filed within 300 days." (citing 42 U.S.C. § 2000e-5(e)(1); *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 384 (5th Cir. 2002))). Fisher filed a charge with the EEOC on April 26, 2006.  Therefore, her actionable period is June 30, 2005, to April 26, 2006.

Only three incidents may be considered harassing conduct occurring within Fisher's actionable period.  First, Fisher claims that during her last week with CSS, three young African–American safety attendants approached Fisher and requested that she help them resolve an issue with unidentified white plant workers.  The attendants revealed to Fisher that the plant workers, who the safety attendants previously reported for safety violations, fashioned a noose and told the attendants that if they did not mind their own business they would "swing from the end of it." (Dkt. 16).  Fisher alleges that although she reported the incident to Lewis, CSS failed to take action in addressing the plant workers' conduct.  The second incident occurred two weeks prior to Fisher's termination.  Allegedly, an issue arose regarding Fisher's reporting an unsafe act to an employee of Innovene, the company which hired CSS for the project.  Fisher claims Browne was livid when he learned that Fisher reported to Innovene before consulting with him.  (Dkt. 16, Ex. 1; Dkt. 13, Ex. B-2, Depo. 221).  Fisher alleges that Browne yelled at her, "[Y]ou need to know your place, you don't run this job!" (Dkt. 16, Ex. 1).  Furthermore, allegedly Browne told Fisher that "[h]e knew why

---

9      [I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier . . . .

42 U.S.C. § 2000e-5(e)(1).

he looked the way he looked because he was old, he was a man, due to drinking, drugs and partying and that's why he looked the way that he looked, but he didn't understand why [she] looked the way [she] looked." (Dkt. 13, Ex. B-2, Depo. 221).  Finally, Fisher testified that the third incident could have occurred near the time of her termination.  (Dkt. 13, Ex. B-2, Depo. 184).  The day of the incident, Daniel Lloyd and another CSS employee complained to Lewis about Fisher directing profanity at them.  Subsequently, all of the parties discussed the issue in Lewis's office.  Later that day, however, Lloyd, in Lewis's presence, requested that Fisher purchase for him a male enhancement drug sold at convenience stores in the type of neighborhood where Fisher resided. Fisher testified that Lloyd and Lewis had laughed at the inappropriate racial and sexual innuendo. (*Id.* at Depo. 182-84)

The remaining incidents, all occurring outside the actionable period, may only be considered as relevant background conduct for the purpose of determining whether the harassment was sufficiently severe so as to cause an abusive work environment. *See Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).  "Such prior conduct 'may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.'" *Id.* at 271 (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)).  In her complaint, Fisher alleges that after CSS hired Browne in August 2004, she was exposed to "repeat" and "severe" harassment due to her race and gender. (Dkt. 1).  Fisher further alleges that CSS, once made aware of the harassment, did not act to prevent it.  In her response to CSS's motion for summary judgment, Fisher sets out several facts to support her claims.  Sometime before October 2004, Fisher found numerous written derogatory racial remarks threatening her life. (Dkt. 16; Dkt. 13, Ex. B-2, Depo. 254-60).  She claims

that although the remarks were painted over, a few weeks later different racial remarks, derogatory, life threatening, and directed at Fisher, reappeared. Fisher claims that consequently she was told by CSS that "such comments were just part of the work environment and she should 'suck it up.'" (*Id.* at Depo. 260).

Fisher further asserts that she was subjected to repeat gender-related comments, that she interpreted as gender stereotyping. (Dkt. 16). At her deposition, Fisher testified that Guerra, Browne, and other unidentified employees repeatedly commented on her femininity and sexuality. On several occasions while working at a CSS project in California sometime during 2004,[10] Guerra allegedly said, "Oh, you're not all girlie and feminine like Sophia, doing your hair and your nails in the office and stuff. You're hardworking. You get out there and get with the crews and get out there and work." (Dkt. 13, Ex. B-2, Depo. 211). In Oklahoma, prior to April 27, 2005,[11] Fisher claims that during every shift, Guerra would comment to the affect, "Man, you guys are really busy and really productive out there, everybody is working really hard, you know, and you know, you're not walking around worrying about your hair." (*Id.* at Depo. 227). Fisher further testified that during the same Oklahoma project, Paul Whitaker approached her and disclosed that unidentified CSS employees were speculating "why it was that [she] was so assertive and the only thing they could come up with was the fact that [Fisher] was gay." (*Id.* at 204).[12]

---

10    Guerra prepared an evaluation for Fisher at the California project on November 1, 2004. (Dkt. 13, Ex. A; *see also infra* note 15).

11    Fisher's last day working at the Oklahoma site. (Dkt. 16, Ex. 7).

12    CSS, in a footnote within its motion for summary judgment, assumes for the purpose of the motion that Fisher can establish a *prima facie* case. Later, however, CSS challenges Fisher's allegations and evidence as insufficient to establish an element of the *prima facie* case. Therefore, the court will disregard CSS's footnoted concession.
      In addition, CSS makes various other objections to Fisher's case. In its reply, CSS notes that Fisher offers no evidence regarding the identity of the person(s) who wrote the pre-October 2004 racial remarks. Further, CSS objects to Fisher's reporting for the first time in her response to CSS's motion for summary judgment the racial confrontation

8

Fisher's evidence, if taken as true, establishes the first three elements of her *prima facie* case based on hostile work environment. Fisher, an African–American woman, alleges that she was the victim of unwelcome harassment based on her race and gender. She has testified as to incidents of racial instigation and gender based commentary in the workplace. However, Fisher fails to provide sufficient proof to show that due to the alleged harassment, a term, condition, or privilege of employment had been affected.

In determining whether alleged harassment affects a term, condition, or privilege of employment, a court will consider the totality of the circumstances, considering factors such as (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether the discriminatory conduct is physically threatening or humiliating, or merely an offensive utterance, and (4) whether the discriminatory conduct unreasonably interferes with an employee's work performance. *Hockman v. Westward Commc'ns, L.L.C.*, 407 F.3d 317, 325-26 (5th Cir. 2004) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993)); *see also Ramsey*, 286 F.3d at 268 (citing *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000)). The plaintiff must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable. *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003) (citing *Harris*, 510 U.S. at 21). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998) (internal citations omitted). Occasional comments, discourtesy, rudeness, or isolated incidents, unless extremely serious, are insufficient to establish severe and pervasive

---

between CSS safety attendants and unidentified plant workers. Finally, CSS points out that Fisher is merely speculating, without relying on any proof, that CSS failed to take action in response to any of the above mentioned incidents. CSS notes, and Fisher admits, that she lacked any meaningful access to the day-to-day managment of CSS business to know whether the issues were addressed.

harassment. *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).  Rather, the harassment "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Felton v. Polles*, 315 F.3d 470, 485 (5th Cir. 2002) (quoting *Ramsey*, 286 F.3d at 268).  Moreover, hostile environment claims based on race "must involve racially discriminatory intimidation, ridicule and insults." *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996) (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 595 (5th Cir. 1995)).  "[T]he mere utterance of an epithet which engenders offensive feelings in an employee is insufficient, without more, to support Title VII liability." *Id.* (internal quotation marks omitted).

Fisher's allegations cannot meet this lofty standard.  The alleged harassment is not so severe and pervasive as to result in a hostile and abusive working environment, altering Fisher's conditions of employment.  In *Wallace v. Texas Tech University*, the Fifth Circuit affirmed summary judgment on a hostile work environment claim where the plaintiff, other than alleging that his supervisor "'routinely [made] racist remarks," failed to provide specific evidence of racist remarks by anyone affiliated with his employer. *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1049-50 (5th Cir. 1996).  In *Ramsey v. Henderson*, the Fifth Circuit came to the same conclusion. *Ramsey*, 286 F.3d 264.  The court found the record "rife with vague assertions of racial animus." *Id.* at 269.  However, the circuit court agreed that although the record clearly indicated that plaintiff's supervisor did not approve of plaintiff's interracial relationship, plaintiff's allegations "[fell] far short of setting forth the requisite elements of a *prima facie* claim of a hostile working environment." *Id.* at 270.

In *DeAngelis v. El Paso Mun. Police Officers Ass'n*, the Fifth Circuit reversed a jury verdict favoring the plaintiff's hostile work environment claim. *DeAngelis*, 51 F.3d 591.  The court

examined several derogatory statements printed in a company leaflet over a span of two and a half years and found them the equivalent of the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee.'" *Id.* at 595 (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986)).  The *DeAngelis* court noted that the weak evidence of any impact of the statements on the plaintiff supported its conclusion. *Id.* at 596.   Finally, the court compared plaintiff's allegations against those that courts had found sufficient for Title VII hostile environment claims.

First, DeAngelis was subjected to no overtly discriminatory professional treatment. She was not a victim of ridicule before her promotion to become the first woman sergeant in the police department. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir. 1990) (derogatory and sexual remarks and conduct against female police officer).   Second, no physical or sexual advances were made on DeAngelis, as has been characteristic of many hostile environment claims. *See, e.g.*, *Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1989) (female employee was repeatedly sexually groped and propositioned); *Carr v. Allison Gas Turbine Div. Gen. Motors*, 32 F.3d 1007 (7th Cir. 1994) (co-workers of female tinsmith cut her overalls and accompanied exposure of themselves with lewd sexual innuendos); *Arnold v. City of Seminole*, 614 F.Supp. 853 (E.D.Okla. 1985) (female police officer subjected to lewd and vulgar sexual comments and innuendos, and discriminatory employment action).   Third, DeAngelis was not preyed upon by a superior whose actions could be interpreted as an abuse of power against a subordinate employee. *Jones v. Flagship Int'l*, 793 F.2d 714 (5th Cir.1986), *cert. denied*, 479 U.S. 1065 (1987).   She was herself in a command position.   Fourth, apart from the claimed

11

impact of the articles, there is no evidence of an atmosphere of sexual inequality or
sexually demeaning treatment within the El Paso Police Department, her employer.
On the contrary, representatives of the police department testified that they were
embarrassed about and exhorted against the R.U. Withmi columns.  Chief Scagno
twice distributed memoranda throughout the police department condemning the R.U.
Withmi columns.

*Id.*

The harassment alleged by Fisher as creating a hostile work environment is the equivalent
of the "mere utterance of an . . . epithet which engenders offensive feelings in an employee." *Id.* at
595.  The conduct fails to approach the requisite severity and pervasiveness common to Title VII
hostile work environment claims.  Fisher offers no evidence to show that she has been negatively
impacted by the conduct.  In fact, the position from which Fisher was finally terminated was
supervisory, among the highest she held while employed by CSS.  The Fifth Circuit's poignant
explanation of the import of legitimate hostile environment claims (in the sexual harassment context)
convinces this court that finding in favor of Fisher's assertion would trivialize the standard into one
of preference.

A claim for a sexually hostile working environment is not a trivial matter.  Its
purpose is to level the playing field for women who work by preventing others from
impairing their ability to compete on an equal basis with men.  One must always bear
this ultimate goal in mind.  A hostile environment claim embodies a series of criteria
that express extremely insensitive conduct against women, conduct so egregious as
to alter the conditions of employment and destroy their equal opportunity in the
workplace.  Any lesser standard of liability, couched in terms of conduct that

12

sporadically wounds or offends but does not hinder a female employee's performance, would not serve the goal of equality. In fact, a less onerous standard of liability would attempt to insulate women from everyday insults as if they remained models of Victorian reticence. A lesser standard of liability would mandate not equality but preference for women: it would create incentives for employers to bend over backwards in women's favor for fear of lawsuits. Now that most American women are working outside the home, in a broad range of occupations and with ever-increasing responsibility, it seems perverse to claim that they need the protection of a preferential standard. The careful, heightened phrasing of a hostile environment claim, enforceable where working conditions have palpably deteriorated because of sexually hostile conduct, aims to enforce equality, not preference.

*Id.* at 593.

The court, therefore, finds no genuine issue of material fact as to Fisher's hostile work environment claim and grants summary judgment in favor of CSS.

## Race Discrimination[13]

Fisher further alleges that she is a victim of race discrimination. She asserts that her termination is the result of her supervisor's and other CSS employees' discrimination against Fisher as an African–American. When a plaintiff attempts to prove allegations of discrimination through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), recently modified in *Desert Palace,*

---

13      When an employee alleges serial violations of Title VII's proscription against employment discrimination, i.e. series of actionable wrongs, as opposed to hostile work environment, a timely EEOC charge must be filed with respect to each discrete alleged violation. *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162, 2175-76 (2007). The discussed incidents are the only ones which potentially fall within Fisher's actionable period.

*Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004).

Under the modified *McDonnell Douglas* approach, the plaintiff carries the initial burden of

establishing a *prima facie* showing of race discrimination. *Abarca v. Metropolitan Transit Auth.*, 404

F.3d 938, 941 (5th Cir. 2005); *Rachid*, 376 F.3d at 312.   A plaintiff meets this burden by showing

that: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she suffered

an adverse employment action; and (4) after she was discharged, she was replaced with a person who

is not a member of the protected class. *Frank*, 347 F.3d at 137 (citing *Bauer v. Albermarle Corp.*,

169 F.3d 962, 966 (5th Cir. 1999)); *Okoye v. Univ. of Tex. Health Sci. Ctr.*, 245 F.3d 507, 512-13

(5th Cir. 2001).

Alternatively, the plaintiff may meet her burden of proving the fourth element by

demonstrating that she was "treated differently from others similarly situated." *Abarca*, 404 F.3d at

941.  To establish disparate treatment, a "plaintiff must show that the employer gave preferential

treatment to another employee under nearly identical circumstances; that is, that the misconduct for

which the plaintiff was discharged was nearly identical to that engaged in by other employees."

*Okoye*, 245 F.3d at 514 (5th Cir. 2001) (internal quotations omitted); *see also Berquist v. Wash. Mut.*

*Bank*, No. 05-20956, 2007 WL 2007333, at *7 (5th Cir. July 12, 2007) ("In disparate treatment

cases, the plaintiff–employee must show 'nearly identical' circumstances for employees to be

considered similarly situated."); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)

("[T]the conduct at issue is not nearly identical when the difference between the plaintiff's conduct

and that of those alleged to be similarly situated accounts for the difference in treatment received

from the employer.").

If a plaintiff makes a *prima facie* showing of race discrimination, the burden shifts to the

defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment

decision. *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006). If a defendant can produce such evidence, the presumption of discrimination dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The plaintiff must then prove "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).

In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus. *Rachid*, 376 F.3d at 312. The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated against her on the basis of the plaintiff's membership in the protected class. *Reeves*, 530 U.S. at 143.

Fisher is an African–American female employed, prior to termination, as a supervisor by CSS. In October 2005, CSS terminated Fisher's employment. Hence, Fisher meets the first three elements of her *prima facie* case of race discrimination. Fisher offers no evidence showing that she was replaced by a person outside of the protected group. Instead, Fisher argues that she was "treated differently from others similarly situated." *Abarca*, 404 F.3d at 941. To support that assertion, Fisher testified that Lewis frequently used profanity. (Dkt. 13, Ex. B-2, Depo. 295). In addition, another CSS employee testified that Browne referred to everyone as "crackheads." (Dkt. 13, Ex. D, Depo. 15). Fisher notes that neither white man was terminated by CSS.

In reply, CSS argues that neither Ron Lewis nor Frank Browne is a similarly situated CSS

employee.  CSS notes that no complaints had ever been registered against Lewis or Browne for "use of fear and intimidation" or "repeated use of vulgar language when addressing [l]eads and [s]afety [a]ttendants."[14]  CSS further distinguishes Fisher by noting that neither Lewis nor Browne had ever been reprimanded or cited for not "managing with compassion and respect, rather than fear and intimidation," for "foster[ing] a defensive atmosphere and creat[ing] overly-critical safety attendants, to the point of hostility," and for having an aggressive approach.[15]  Finally, evidence on the record suggests that no one considered Lewis or Browne abusive or aggressive managers.[16]

In contrast, numerous complaints were lodged against Fisher for being aggressive and using profanity towards CSS employee–subordinates.  In addition, Frank Guerra's 2004 written evaluation criticized Fisher's unacceptable management style.  Lastly, a few days prior to her termination, Fisher met with Lewis and Browne after the latter "observ[ed] Ms. Fisher's interaction with a new employee and hearing disturbing reports about Ms. Fisher's treatment of lead persons and safety

---

14    Complaints filed on October 17 and 18 by CSS employees reported that Fisher instilled fear through verbal abuse and intimidation. (Dkt. 13, Ex. A-4).

15    In November 2004, Frank Guerra prepared an evaluation of Fisher's work performance.  The evaluation explained to Fisher that "[her] role in leadership demands a level of professionalism and compassion."  The evaluation notes the following areas of improvement:
- "[M]anage with compassion and respect, rather than fear and intimidation. . . . [T]here is a difference between being tough and being firm."
- "[B]e cautious of comments made in the presence of safety attendants."
- "[R]eferences to 'stabbing' people have to stop."
- "[You] establish credibility by stating . . . [your expectations of] . . . [safety] attendants and then intimidate them verbally . . . in [an unacceptable] manner . . . . This fosters a defensive atmosphere and creates overly-critical safety attendants, to the point of hostility, toward craft persons, at the slightest deviation from safe work practices, thus creating an environment of 'Safety Police.'"
- "You need to control you aggressive approach and cultivate an environment of team work. This is mandatory."

(Dkt. 13, Ex. A-2).

16    Yolanda Florence, a CSS employee, testified that Browne was an intimidating figure. However, she never accused him of using that demeanor to manage.  At one point, Florence testified about Lewis's using a profanity. She explained, however, that "he used that word, he used it in a way that wasn't really menacing or threatening.  It was just . . . [t]he way he talked." (Dkt. 13, Ex. D, Depo. 71).

attendants." (Dkt. 13, Ex. A).  At the meeting, Fisher was reminded that "CSS expected supervisors

and lead persons to be caring and professional when talking to employees." *Id.*  Clearly Fisher,

Lewis, and Browne are not similarly situated.  Therefore, Fisher fails to meet her *prima facie* burden

of proof.  CSS's motion for summary judgment on Fisher's racial discrimination claim is granted.

### Sex Discrimination[17]

Fisher also alleges that CSS unlawfully terminated her employment because of her sex. In

evaluating claims of sex discrimination, courts apply the same burden-shifting framework first

announced in the racial discrimination context in *McDonnell Douglas*. *See Travis v. Bd. of Regents

of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir. 1997). Fisher's only other evidence directed

at the fourth element of her *prima facie* case for sex discrimination is that Sophia Brown, an

African–American woman employed by CSS, was "verbally abusive and used vulgar language"

towards CSS employees but was never discharged. (Dkt. 13, Ex. B-2, Depo. 215).  Fisher argues that

Brown was not terminated because CSS supervisors thought she was more feminine than Fisher.

Therefore, she alleges that her termination was the result of unlawful discrimination based on sex-

stereotyping.

CSS argues that it is illogical for Fisher to contend that because of Brown's femininity, CSS

excused her "unfeminine" conduct. (Dkt. 13).  Although that may very well be true, it is not out of

the realm of possibility for an employer to favor a more feminine employee who uses coarse

language, over a less feminine employee who uses the same language.  CSS also attempts to

distinguish Fisher on the basis that management was made aware of her conduct as a result of the

filed complaints.  However, although there is no evidence that a formal complaint had ever been

---

17      *See supra* note 13.

lodged against Brown, Fisher testified that Guerra witnessed the incident and that Browne was aware of it. (Dkt. 13, Ex. B-2, Depo. 235).   This evidence tends to show that CSS management had knowledge of the incident.

Nevertheless, it is proof of only one incident.   In contrast, Fisher had been previously cited by CSS for inappropriate and unacceptable behavior.   Numerous formal complaints were lodged by several CSS employees against Fisher for inappropriate use of profanity and an unprofessional management style. (Dkt. 13, Ex. A-4).   Shortly before Fisher's termination, Browne witnessed Fisher's "anger, shortness, a[nd] meanness when first meeting [a] new hire." (Dkt. 16, Ex. 5, Depo. 33).   Most importantly, Fisher held a supervisory position with CSS at the time of her insubordination and eventual termination.   Brown was not a CSS supervisor.

For the forgoing reasons, Fisher and Brown were not similarly situated CSS employees. Therefore, Fisher fails to meet her *prima facie* burden of proof.   CSS's motion for summary judgment on Fisher's sex discrimination claim is granted.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. Defendant's motion to strike evidence is DENIED as moot.

Signed at Houston, Texas on October 2, 2007.

_____
Gray H. Miller
United States District Judge

18